**REMITTITUR SUGGESTED; and Opinion Filed May 11, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01616-CV

**LONE STAR ENGINE INSTALLATION CENTER, INC. AND RAFAEL SANCHEZ, Appellants**
**V.**
**BRENDA GONZALES AND GONZALO GONZALES, Appellees**

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-11-15035**

## MEMORANDUM OPINION

Before Justices Fillmore, Evans, and Stoddart
Opinion by Justice Fillmore

Appellees Brenda and Gonzalo Gonzales sued appellants Lone Star Engine Installation Center, Inc. (Lone Star) and Rafael Sanchez,[1] alleging, as relevant to this appeal,[2] that appellants violated the Texas Deceptive Trade Practices Act (DTPA), *see* TEX. BUS. & COM. CODE ANN. §§ 17.41–.63 (West 2011 & Supp. 2015), in connection with repairs appellants made to appellees' 2006 Ford F-350 pickup truck. The trial court found appellants intentionally engaged in conduct that violated the DTPA and awarded appellees economic and mental anguish damages, additional economic and mental anguish damages under section 17.50(b) of the DTPA,

---

[1] Sanchez owns the stock of Lone Star.

[2] In addition to their claims under the DTPA, appellees asserted claims based on fraudulent misrepresentation, negligent repair of a motor vehicle, and breach of implied warranty. The trial court made findings of fact that would have supported a judgment against appellants based on any of these theories of liability. Comparing the judgment to the trial court's findings of fact, it appears appellees elected to recover on their DTPA cause of action.

and attorney's fees.  In ten issues, appellants contend the trial court's judgment should be reversed because appellees are judicially estopped from bringing their claims against appellants, the evidence is legally and factually insufficient to support the trial court's findings that appellants violated the DTPA, and the amount of damages awarded by the trial court, and the trial court erred by allowing two experts to testify for appellees and allowing one of the experts to use certain demonstrative exhibits.  We affirm the trial court's judgment, conditioned on appellees' agreement to remit a portion of the damages they were awarded.

### Background

Appellees filed for Chapter 13 bankruptcy on December 2, 2009.  In connection with the filing, appellees signed several sworn schedules under oath.  These schedules reflected outstanding creditor claims totaling $102,572.35 and that appellees had no contingent or liquidated claims.  Appellees also swore they were not parties to any "suits and administrative proceedings."  On April 20, 2010, the bankruptcy court confirmed appellees' March 2, 2010 amended bankruptcy plan.[3]  Pursuant to the confirmation order, appellees were required to make sixty monthly payments to the Chapter 13 trustee of varying amounts totaling $49,212.00.

At some point, Gonzalo noticed appellees' Ford F-350 pickup truck, the family's main vehicle, was overheating, "smoking a little bit," and did not have towing power.  Neither Gonzalo nor Brenda knew what was wrong with the truck, and Gonzalo contacted Sanchez about repairing it. On June 23, 2010, a tow truck provided by appellants towed the truck to Lone Star. Gonzalo testified he told Sanchez about the problems with the truck.  According to Brenda, after Sanchez examined the truck, he told appellees that it needed a new "long block."[4]  Sanchez

---

[3] This plan is not in the record.

[4] According to Michael Farmer, appellees' expert witness, a long block generally consists of approximately eighty percent of the engine, including cylinder heads, rotating assembly, pistons, connecting rods, bearings, crank shaft, camshaft, bushings, valves, and lifter.  It could also possibly include push rods.  When Sanchez was asked what he meant by "long block rebuild engine," he responded, "It's a short block.  The short block includes all the internal parts; like a crank shaft, connected rods, piston, piston rings, [and] timing components."

testified no one working at Lone Star told appellees the truck needed a new "long block." Rather, the truck was not working when it was towed into the shop, and Gonzalo, without telling anybody at Lone Star that the truck was overheating, requested a "long block" be installed in the truck. Sanchez told Gonzalo it would cost $3,800 to repair the truck, and Gonzalo agreed to have the work done.[5]

Sanchez, a master mechanic, performed eighty percent of the work on the truck. He installed the long block, a rebuilt radiator, a reconditioned "turbo," and two injectors. After Sanchez worked on the truck, he told appellees the actual cost of the repairs was $6,161. Appellees paid the charges, and appellants provided a six month warranty on the work done on the truck. The warranty stated it was void if appellees allowed anyone other than Lone Star to work on the truck. Brenda testified that, when they arrived at Lone Star to pick up the truck, it would not start and was "boosted" in order to get it started. According to Sanchez, the truck was working perfectly and no jump start was required.

Brenda drove the truck to appellees' home. During the drive, Brenda noticed the truck was overheating. The next morning, the truck would not start, and appellees saw that one of the batteries in the truck was not the correct size and was not the battery that had been in the truck when it was towed to Lone Star. Brenda also noticed "a lot of wires and stuff" were attached, the radio no longer worked, the floor mats were gone, and the carpet had been moved. Gonzalo returned the truck to Lone Star and complained that the original battery was missing. When the original battery could not be found, Sanchez paid Gonzalo compensation.

Appellees continued to have problems with the truck overheating and not having any towing power. However, they did not take the truck back to appellants because they did not have

---

[5] We note there was evidence the initial quote was $3,850. This discrepancy is not material to our analysis.

the money for additional repairs. Because the truck was not working properly, appellees used Brenda's small car and a pickup truck they borrowed from a neighbor for transportation.

At some point in 2011, Gonzalo took the truck to Farmer's Diesel & Performance (FD&P) and told Michael Farmer, the diesel mechanic who owns FD&P, that he had concerns about the overhaul that had been done by Lone Star on the engine of the truck. Farmer determined from an inspection of the truck that the auxiliary component's wiring had been disturbed and there was an audible noise, similar to "two pipe hands being slapped together." Farmer told Gonzalo that he thought there was an external head gasket leak and he was hearing the combustion event rattle the head gasket. Farmer advised Gonzalo to take the truck back to the person who had performed the work. Appellees began renting a car on March 2, 2011, when Brenda's car also began having problems. According to Gonzalo, the rental car was to replace the truck while it was in for repairs. Appellees paid $3,117.87 to rent a car until July 1, 2011.

Gonzalo spoke to Sanchez about the problems appellees were having with the truck. Sanchez assured Gonzalo that it was not a problem that the warranty period had expired and, on March 15, 2011, Gonzalo arranged for the truck to be taken to Lone Star on a flatbed trailer. Gonzalo testified the truck had been driven only about 125 miles since appellees picked it up from Lone Star because the truck was overheating. According to Sanchez, there was oil and water mixing in the truck and blowing steam out of the tailpipe. He told appellees the truck needed a new exhaust gas recirculation (EGR) cooler and that the work would cost $750. Sanchez installed the EGR cooler and, in doing so, "modified" one of the ports to the EGR system by welding two plugs into the cooler. Sanchez claimed the work he performed redirected, but did not cut off, the coolant flow to the engine and the modification complied with modifications being done by Ford and by the "aftermarket." In Sanchez's opinion, the engine ran cooler after the modification because of greater water flow velocity. Sanchez also replaced

–4–

one of the injectors because the truck "was missing on one cylinder." Lone Star charged appellees $1,198 for the repairs.

Sanchez drove the truck after these repairs were complete and discovered the transmission would "lock up" whenever the truck shifted into second gear. Appellees both testified the transmission was working when the truck was taken to Lone Star, but Sanchez denied that any of the work he performed would have affected the transmission. Sanchez offered to replace the transmission if appellees would pay for the labor, but appellees chose to take the truck to Juan's Transmission. Appellees paid Juan's Transmission $1,405.71 to repair the transmission.

In the summer of 2011, Gonzalo took the truck back to FD&P. Farmer testified the truck had white smoke in the exhaust at initial start, the truck had a "hard start," and Gonzalo complained the engine had been overheating. After a driving test, Farmer confirmed the oil temperature in appellees' truck was "extremely excessive." To determine whether an injector was bypassing too much high pressure oil, Farmer removed the injectors and performed bench tests. The tests indicated a "couple" of the injectors were bypassing oil and there was extensive damage to the spool valves on those injectors. Farmer replaced three of the injectors. After these repairs, the truck was operable, and Gonzalo instructed Farmer to perform no additional repairs because he did not have the money to pay for the additional work.

However, when Gonzalo arrived at FD&P to retrieve the truck, it would not start. Farmer performed additional testing and discovered the injection pressure regulator (IPR) had failed. The IPR determines the amount of oil directed toward the injectors. When Farmer removed the IPR, he found it had "disassembled itself" from its normal mounting position. Farmer testified that his work on the injectors did not cause the IPR failure; rather, it failed because it was the "next weakest link" after the injectors were repaired.

According to Farmer, the injectors and the IPR failed because the oil filter allowed contaminants to enter those components. Farmer removed the oil filter and discovered the oil filtration bypass pressure plug was "nowhere to be found." He disassembled the upper intake system, the turbocharger system, and the oil cooler housing and found the bypass plug had melted and the residue had run down inside the housing. After the bypass plug melted, the oil in the truck was not filtered. Farmer examined the high pressure oil reservoir and found a "soup of metal material" in that reservoir. The oil cooler had "quite a bit of clogging due to the particulate that had been through it." According to Farmer, the lack of an oil filter led to the IPR "disassembling" itself and would lead to erosion throughout the engine. Farmer testified that every "rotating assembly unit" inside the truck's engine was damaged.

Farmer testified peak operating temperature for the engine is 212 degrees Fahrenheit, and the bypass plug is designed to withstand temperatures up to 500 degrees Fahrenheit. Attempting to locate the source of the high temperature, Farmer examined the EGR cooler, which is designed to "exchange heat from the exhaust into the coolant in order to cool the exhaust inflow into the intake of a vehicle." Farmer found the inlet and outlet flow ports to the EGR cooler had been welded shut. There was an additional weld in the "circuit on the block." In Farmer's opinion, no reasonable mechanic would weld closed the ports on the EGR cooler because doing so would block all coolant flow in the system. Although Sanchez admitted he welded two plugs into the EGR cooler, he denied he placed those plugs at the locations identified by Farmer.

Farmer testified the coolant flow system in the truck is "linear" and stopping the flow of the coolant at any one point stops the flow to the entire system. If the coolant is blocked and cannot reach the radiator, the engine will overheat. If the radiator is not working properly, the transmission components could also overheat. Temperatures of 500 degrees Fahrenheit in the engine could result in damage to the transmission. Sanchez testified there were many causes of

transmission failure and denied that any of the work he performed on the truck damaged the transmission.

Farmer also found a small hole had been drilled in the degas bottle, which is designed to maintain coolant pressure and allow gasification of coolant to escape the coolant system. According to Farmer, if the degas bottle has a hole in it, the coolant pressure cannot be contained and, over time, the coolant will evaporate, leading to excessive temperatures in the engine. Farmer testified that drilling a hole in the degas bottle is not an "industry standard way" to reduce pressure in the cooling system. Sanchez denied that he drilled a hole in the degas bottle in appellees' truck. In Farmer's opinion, "the welding and the EGR cooler" damaged the truck, and appellants "modifications" to the engine caused the need for all the subsequent repair work on the engine. Farmer charged $2,909.58 to repair the truck.

Gonzalo brought the truck back to FD&P on December 4, 2011, because he was having additional high pressure oil system failures. Farmer discovered the five injectors that had not been replaced or repaired during his prior repairs had failed. Farmer testified the failure of these five injectors was related to the problems the truck was having when he first worked on it, but appellees could not afford to replace all the injectors during the previous repairs. Farmer charged appellees $1,807.98 for the additional repairs.

According to Farmer, engine overheating is typically caused by the failure of an EGR cooler, a fan clutch, or a head gasket. If white smoke was detected in the exhaust, Farmer would suspect the problem was an EGR cooler failure or an EGR valve sticking intermittently at low power. In Farmer's opinion, if appellants had repaired the EGR cooler in June 2010 in accordance with industry standards, no additional repairs would have been required on appellees' truck. In Farmer's experience, it would have cost approximately $900 to do an industry-standard repair of the EGR cooler.

Appellees contacted the Southern Methodist University Dedman School of Law's Civil Clinic (the Clinic) concerning any claims they might have against appellants. On December 1, 2011, the Clinic filed this lawsuit on appellees' behalf. In January 2012, the Chapter 13 trustee in appellees' bankruptcy filed a motion to dismiss the bankruptcy because appellees had failed to comply with their obligations under the confirmed plan. On January 17, 2012, appellees converted the Chapter 13 bankruptcy case to a Chapter 7 case, and Michael J. McNally was appointed as the Chapter 7 trustee. Appellees filed schedules in the Chapter 7 case, but failed to disclose their claims against appellants. A creditors meeting under section 341 of the bankruptcy code was held on February 24, 2012. At that meeting, in response to questions from their bankruptcy attorney, Amy Skinner, and from McNally, Brenda and Gonzalo both affirmed they did not have anybody they "could sue at this time" or any "claim or cause of action or potential lawsuit" that they could bring in order to recover money. Skinner testified she counseled appellees to answer the questions as they did because she did not believe the Clinic was pursuing the claims on appellees' behalf.

Following the creditors meeting, Skinner learned the Clinic had decided to pursue the claims. On March 21, 2012, Skinner wrote a letter to McNally disclosing the existence of the lawsuit and stating she agreed with the Clinic's position that the claim was not an asset of the Chapter 7 bankruptcy estate. McNally testified he received the letter and took no further action because he agreed the claim did not belong to the Chapter 7 bankruptcy estate. The bankruptcy court signed an order discharging appellees on May 24, 2012, and the bankruptcy case was closed on June 18, 2012.

The trial court found in favor of appellees and awarded economic damages of $16,600.14 and mental anguish damages of $5,000. Pursuant to section 17.50 of the DTPA, the trial court also awarded additional economic damages of $16,600.14 and mental anguish damages of

$5,000. Finally, the trial court awarded appellees $15,000 for attorney's fees through trial as well as contingent attorney's fees on appeal. The trial court made findings of fact and conclusions of law in support of the judgment, and appellants brought this appeal.

## Standards Applicable to Trial by Court

In an appeal from a bench trial, we review a trial court's findings under the same legal and factual sufficiency-of-the-evidence standards used when determining if sufficient evidence exists to support an answer to a jury question. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Bayview Loan Servicing, LLC v. Martinez*, No. 05-14-00835-CV, 2016 WL 825670, at *2 (Tex. App.—Dallas Mar. 3, 2016, no pet. h.) (mem. op.). We review de novo the trial court's conclusions of law. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). If the trial court rendered the proper judgment, we will not reverse based on an erroneous conclusion of law. *Id.*; *Bayview Loan Servicing, LLC*, 2016 WL 825670, at *2.

When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof at trial, it must demonstrate there is no evidence to support the finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Conversely, when the party who had the burden of proof at trial complains on appeal that the evidence is legally insufficient to support an adverse finding, that party must demonstrate the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem Co. v. Francis*¸ 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). In determining whether the evidence is legally sufficient to support a finding, we consider the evidence in the light most favorable to the judgment and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 807, 827. "The final test for legal

sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

In evaluating a factual sufficiency challenge, we consider and weigh all of the evidence, not just the evidence supporting the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.*; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819 (legal sufficiency review); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency review). We will not substitute our judgment for that of the trial court merely because we might reach a different conclusion. *City of Keller*, 168 S.W.3d at 819, 822; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

### Judicial Estoppel

In their first issue, appellants contend they conclusively established the doctrine of judicial estoppel so appellees are barred from pursuing their claims against appellants and, therefore, the trial court erred by failing to dismiss the case. Judicial estoppel is an affirmative defense, and appellants had the burden of proof to establish it applied to appellees' claims. *Spartan Tex. Six Capital Partners, Ltd. v. Perryman*, No. 14-14-00873-CV, 2016 WL 796073, at *9 (Tex. App.—Houston [14th Dist.] Mar. 1, 2016, no pet. h.) (considering application of judicial estoppel to claims being pursued post-bankruptcy that were not disclosed in bankruptcy proceedings); *Phillips v. Flying J Inc.*, 375 S.W.3d 367, 369 (Tex. App.—Amarillo 2012, no pet.) (per curiam). Because appellants raised judicial estoppel in the context of appellees' duties under the bankruptcy code in a prior bankruptcy proceeding, we apply substantive federal law in

–10–

our analysis of this issue. *Norris v. Brookshire Grocery Co.*, 362 S.W.3d 226, 229 (Tex. App.—Dallas 2012, pet. denied).

We review the trial court's decision whether to apply judicial estoppel for abuse of discretion. *Allen v. C&H Distribs., L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015). Generally, when substantive federal claims are raised in state court, state law and procedural rules still govern manner in which federal questions are tried and proved. *See Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992) (orig. proceeding); *Mitchell v. Missouri-Kansas-Texas R.R. Co.*, 786 S.W.2d 659, 661 (Tex. 1990), *overruled on other grounds by Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 169 (Tex. 2002). Because judicial estoppel is a "rule of procedure based on justice and sound public policy," *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008), we apply Texas law pertaining to the standard of review. *Gator Apple, LLC v. Apple Tex. Rests., Inc.*, 442 S.W.3d 521, 530 n.4 (Tex. App.—Dallas 2014, pet. denied) (standard of review is procedural question).[6] A trial court abuses its discretion when it acts arbitrarily or unreasonably, that is, when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *see also U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012).[7]

*Applicable Law*

Judicial estoppel "is an equitable doctrine invoked by a court at its discretion" for the purpose of "protect[ing] the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (internal quotation marks omitted). It prevents parties from "playing

---

[6] *See also Ferguson v. Building Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam) (applying summary judgment standard of review under state law to issue of whether plaintiffs were judicially estopped from asserting personal injury claims against defendant based on failure to timely disclose claims in bankruptcy proceeding); *Norris*, 362 S.W.3d at 229 (same).

[7] The outcome of this case would be the same applying the federal standard of review. *See Love v. Tyson Foods, Inc.*, 677 F.3d 258, 262 (5th Cir. 2012) ([D]eference . . . is the hallmark of an abuse-of-discretion review."). Under the federal standard of review, a trial court abuses its discretion when it bases its decision on clearly erroneous factual findings, relies on erroneous conclusions of law, or misapplies the law the facts. *Id.*

fast and loose with the courts to suit the exigencies of self-interest," *Allen*, 813 F.3d at 572 (quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999)), by prohibiting "a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed v. City of Arlington*, 650 F.3d 571, 573–74 (5th Cir. 2011) (en banc) (quoting 18 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 134.30 at 63 (3d ed. 2011)). The doctrine is generally applied "where intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice." *In re Coastal Plains, Inc.*, 179 F.3d at 206 (quoting *Scarano v. Cent. R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953)).

In the bankruptcy context, judicial estoppel is used to effectuate the policy goals of "bring[ing] about an equitable distribution of the bankrupt's estate among creditors" and "grant[ing] a fresh start to the honest but unfortunate debtor." *Reed*, 650 F.3d at 574 (quoting *Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 227 (1930) and *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007)). Therefore, the doctrine "must be applied in such a way as to deter dishonest debtors, whose failure to fully and honestly disclose all their assets undermines the integrity of the bankruptcy system." *United States ex rel Long v. GSDMidea City LLC*, 798 F.3d 265, 271 (5th Cir. 2015) (quoting *Reed*, 650 F.3d at 574). In order for judicial estoppel to apply, the trial court should look to whether (1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently. *Id.* at 271–72. However, the presence of one or more of these elements does not mandate the invocation of judicial estoppel. *Id.* at 272. Rather, the trial court should determine if applying judicial estoppel is appropriate in light of the specific facts of each case and the doctrine's purpose of protecting the integrity of the judicial process. *Id*; *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012) ("[J]udicial

estoppel is not governed by 'inflexible prerequisites or an exhaustive formula for determining [its] applicability,' and numerous considerations 'may inform the doctrine's application in specific factual contexts.'" (quoting *New Hampshire*, 532 U.S. at 751)).

As relevant to this appeal, when a debtor institutes a Chapter 13 bankruptcy case, a bankruptcy estate is created. *See* 11 U.S.C. §§ 301, 541. Virtually all of the debtor's assets vest in the bankruptcy estate upon the filing of the Chapter 13 petition. *Id.* § 541; *see also Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) (per curiam). The debtor is required to file schedules listing the debtor's assets and liabilities and a statement of the debtor's financial affairs. 11 U.S.C. § 521(a)(1)(B)(i), (iii); FED. R. BKRTCY. P. 1007(b). In a typical Chapter 13 case, the bankruptcy estate is administered, through a plan developed by the debtor, by the bankruptcy trustee over a period of three to five years. *Id.* §§ 1302, 1321–22; *Harris v. Veigelahn*, 135 S. Ct. 1829, 1835 (2015). The Chapter 13 debtor has a continuing obligation while the Chapter 13 bankruptcy proceeding is pending to disclose a post-petition cause of action acquired by the debtor. *Allen*, 813 F.3d at 572; *Flugence v. Axis Surplus Ins. Co. (In re Flugence)*, 738 F.3d 126, 129 (5th Cir. 2013) (per curiam).

A debtor may convert his Chapter 13 bankruptcy case to a liquidation under Chapter 7 of the bankruptcy code. 11 U.S.C. § 1307(a); *Harris*, 135 S. Ct. at 1835. "No motion or court order is needed to render the conversion effective." *Harris*, 135 S. Ct. at 1835–36 (citing FED. R. BKRTCY. P. 1017(f)(3)). Such a conversion does not effect a change in the date of the filing of the petition. 11 U.S.C. § 348(a). Once a Chapter 13 case is converted to a Chapter 7 case, "property of the estate in the converted case shall consist of property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on

–13–

the date of conversion." *Id.* § 348(f)(1)(A).[8] Whether a particular cause of action belongs to the Chapter 7 bankruptcy estate "depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case." *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994)

*Analysis*

Appellants argue the trial court abused its discretion by failing to apply judicial estoppel to bar appellees' claims against appellants because appellees had a duty to disclose their claims against appellants in the bankruptcy case, their failure to disclose the claims was a representation to the bankruptcy court that the claims did not exist, and the bankruptcy court relied on that representation when it granted appellees a "no asset" discharge in the Chapter 7 case. The trial court concluded the existence of appellees' "post-petition claims against [appellants] was not material to the bankruptcy case and so could not have been relied upon by the bankruptcy court to effect its Chapter 7 discharge order," which relates to judicial acceptance, the second element of judicial estoppel. *See Long*, 798 F.3d at 271. The acceptance element ensures that judicial estoppel is applied only in situations where the integrity of the judicial process is jeopardized. *Wells Fargo Bank, N.A. v. Oparaji (In re Oparaji)*, 698 F.3d 231, 237 (5th Cir. 2012); *see also Allen*, 813 F.3d at 572–73. "Absent judicial acceptance of the inconsistent position, application of the rule is unwarranted because no risk of inconsistent results exists." *Allen*, 813 F.3d at 572–73 (quoting *In re Oparaji*, 698 F.3d at 237).

The judicial acceptance requirement does not mean the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits. *In re Coastal Plains, Inc.*,

---

[8] If it is determined a debtor "convert[ed] a case under Chapter 13 . . . to a case under another chapter under [Title 11] in bad faith, the property of the estate in the converted case shall consist of the property of the estate as of the date of conversion." 11 U.S.C.§ 348(f)(2). There are no allegations appellees acted in bad faith in converting their bankruptcy case from a Chapter 13 proceeding to a Chapter 7 proceeding.

179 F.3d at 206. Rather, judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition. *Id.* "Although the Fifth Circuit has noted that the 'contours' of this prong are vague, it has in practice required that the prior court 'actually accept' the party's earlier position." *Norris*, 362 S.W.3d at 230 (citing *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 348 n.2 (5th Cir. 2008)). A court accepts the party's position if it relies on the assertion in making a decision or ruling. *Horsley-Layman v Adventist Health Sys./Sunbelt, Inc.*, 221 S.W.3d 802, 808 (Tex. App.—Fort Worth 2007, pet. denied) (citing *In re Coastal Plains, Inc.*, 179 F.3d at 206); s*ee also In re Flugence*, 739 F.3d at 130 (judicial acceptance element satisfied when "the bankruptcy court accepted the prior position by omitting any reference to the personal-injury claim in the modified plan" because "[h]ad the court been aware of the claim, it may well have altered the plan"); *Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 600 (5th Cir. 2005) (judicial acceptance element satisfied when bankruptcy court confirmed debtor's bankruptcy plan in reliance on the veracity of his asset schedules).

In this case, appellees' claims against appellants did not arise until after the confirmation of appellees' amended Chapter 13 bankruptcy plan. Appellees did not amend their schedules in the Chapter 13 proceeding to include their post-petition, post-confirmation claims against appellants and did not include the claims on the schedules filed after the Chapter 13 case was converted to a Chapter 7 case. While under oath at the creditors' meeting following the conversion to a Chapter 7 case, appellees denied the existence of any lawsuits pursuant to which they might collect money.[9] Approximately three weeks after the creditors' meeting, appellees disclosed their claims against appellants in a letter to the Chapter 7 trustee. The Chapter 7

---

[9]Appellees' testimony at the creditors' meeting was incorrect. However, due to a miscommunication about the status of the filing of this lawsuit, appellees' bankruptcy counsel instructed them to answer the questions as they did. Appellees' bankruptcy counsel took steps to correct the incorrect testimony by informing the Chapter 7 trustee of the claims once she was aware that the lawsuit against appellants was proceeding.

trustee agreed with appellees' bankruptcy counsel that the claims against appellants were not property of the Chapter 7 bankruptcy estate and took no action after he learned of the claims. The bankruptcy court granted appellees a "no asset" discharge approximately two months after they disclosed the claims to the Chapter 7 trustee.

Based on the record before us, appellants failed to conclusively establish the bankruptcy court relied on or accepted any representations by appellees that they did not have a claim against appellants. There is no evidence that, after appellees' claims against appellants accrued, the bankruptcy court took any action or made any ruling in the Chapter 13 bankruptcy case which would have required it to rely on appellees' implied representation they did not have any claims against appellants. *See Banks v. Corrections Corp. of Am.*, No. 4:30CV401-P-B, 2005 WL 1876371, at *2 (N.D. Miss. Aug. 8, 2005) (acceptance element not satisfied when record does not reflect bankruptcy court relied upon failure to disclose post-petition claim in amended schedule in Chapter 13 case and "[c]ommon sense suggests that the nondisclosure was harmless"). Following the conversion to a Chapter 7 case, the only action taken by the bankruptcy court in reliance on appellees' schedules was the granting of a "no asset" discharge. However, appellees' claims against appellants, which were acquired after the filing of the Chapter 13 bankruptcy petition, were not property of the Chapter 7 estate. 11 U.S.C. § 348(f)(1)(A); *Harris*, 135 S. Ct. at 1835 (Chapter 7 debtor is able to make "fresh start" by shielding from creditors his post-petition earnings and acquisitions). The lack of an amended schedule listing an asset "that is not property of the bankruptcy estate and cannot be administered by the Chapter 7 trustee has no impact on the entry of a discharge order in a Chapter 7 case." *In re Wakefield*, 312 B.R. 333, 339 (N.D. Tex. 2004).

Judicial estoppel is an equitable doctrine applied at the trial court's discretion based on the particular facts in a case. *New Hampshire*, 532 U.S. at 749–50; *Long*, 798 F.3d at 272.

Although we do not condone appellees' failure to disclose in their bankruptcy proceeding that they had claims against appellants, the record does not reflect appellees' failure to do so was an "intentional self-contradiction . . . being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice," *In re Coastal Plains, Inc.*, 179 F.3d at 206,[10] or undermined the integrity of the judicial process. *See Long*, 798 F.3d at 271. Based on this record, and giving proper deference to the trial court's ruling, we cannot conclude the trial court abused its discretion by refusing to apply the doctrine of judicial estoppel to bar appellees from pursing their claims against appellants. *See Fannin v. Fereday*, No. 01-13-00951-CV, 2015 WL 4463694, at \*6 (Tex. App.—Houston [1st Dist.] July 21, 2015, no pet.) (mem. op.) (trial court did not abuse its discretion by failing to apply doctrine of judicial estoppel when it could have reasonably concluded party was not successful in persuading prior courts in accepting his position); *see also Nine Syllables, LLC v. Evans*, No. 05-13-01677-CV, 2015 WL 3932751, at \*6 (Tex. App.—Dallas June 26, 2015, no pet.) (mem. op.) (trial court did not abuse discretion in refusing to apply doctrine of judicial estoppel when, based on facts of case, it could have reasonably concluded party was not entitled to benefit of equity).[11] We resolve appellants' first issue against them.

## Expert Testimony

In their eighth and ninth issues, appellants assert the trial court erred by considering expert testimony from Farmer because he was not qualified to testify and his testimony was not reliable and from Eliot Shavin, appellees' expert witness on attorney's fees, because his testimony was not reliable. Appellees initially contend appellants waived these issues because

---

[10] *See also Ferguson*, 295 S.W.3d at 644 (doctrine of judicial estoppel did not apply to bar claims because parties had taken neither a clearly inconsistent position nor obtained an unfair advantage by failing to initially disclose personal injury claim in bankruptcy proceeding).

[11] *See also In re Paige*, 610 F.3d 865, 877 (5th Cir. 2010); *Perryman*, 2016 WL 796073, at \*10 (recognizing court not required to apply judicial estoppel even if elements met) (citing *Long,* 798 F.3d at 271–72).

–17–

they failed to timely object to Farmer's or Shavin's testimony pursuant to the trial court's scheduling order and failed to timely object to the testimony at trial.

In a scheduling order signed on April 2, 2012, the trial court set the case for trial on November 12, 2012, and ordered that, unless otherwise provided by order, none of the deadlines established in the scheduling order would be altered if the case was reset or continued. As relevant to this issue, the scheduling order stated the deadline for filing a motion to exclude or limit expert testimony was forty-five days before the initial November 12, 2012 trial setting, or September 28, 2012, or "such objection is waived." Appellants did not object to Farmer's or Shavin's testimony by the September 28, 2012 deadline.

A trial court has wide discretion to manage its docket, and we will not interfere with the exercise of that discretion without a showing of clear abuse. *Bagwell v. Ridge at Alta Vista Invests. I, LLC*, 440 S.W.3d 287, 292 (Tex. App.—Dallas 2014, pet. denied). We review a trial court's enforcement of its scheduling order for an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court acts in an unreasonable and arbitrary manner, or when it acts without reference to guiding rules or principles. *Gunn v. Fuqua*, 397 S.W.3d 358, 377 (Tex. App.—Dallas 2013, pet. denied). "When reviewing matters committed to the trial court's discretion, we may not set aside the trial court's ruling unless it is clear from the record that the trial court could reach only one decision." *McKinney Ave. Properties No. 2, Ltd. v. Branch Bank & Trust Co.*, No. 05-14-00206-CV, 2015 WL 3549877, at *3 (Tex. App.—Dallas June 5, 2014, no pet.) (mem. op.).

The trial court ordered that all motions to exclude or limit expert testimony were required to be filed by September 28, 2012, or the objections were waived. Appellants failed to timely object to Farmer's or Shavin's testimony as an expert witness and, therefore, have waived any such objections on appeal. Further, appellants do not challenge the trial court's exercise of its

–18–

discretion in making any of the rulings set out in the scheduling order or by enforcing the scheduling order. We resolve appellants' eighth and ninth issues against them.

**Demonstrative Exhibits**

In their tenth issue, appellants contend the trial court abused its discretion by allowing appellees to use as demonstrative exhibits several automobile parts Farmer removed from appellees' truck. Appellants specifically argue they were surprised by the use of the parts as demonstrative exhibits, the use of the parts was prejudicial, and the parts were not listed on appellees' exhibit list.

Farmer testified he kept some of the parts he removed from appellees' truck and brought those parts to trial. Appellants objected that the parts had not been listed on appellees' exhibit list. Appellees indicated the parts were not being offered into evidence. Appellants then objected:

> In that case, Your Honor, it's not for demonstrative purposes, they need to show this exactly as direct evidence of what happened, not for demonstration purposes. And unless they do that, I don't believe the Court has – I'm sorry. It's my position that the Court should deny the admission of this evidence, which we've never had an opportunity to inspect.[12]

The trial court sustained the objection and ordered the parts would not be admitted into evidence, but allowed Farmer to use the parts as demonstrative exhibits.

Even if the trial court erred by allowing Farmer to use the parts as demonstrative exhibits, appellants were required to show they were harmed by the use of the parts. *See* TEX. R. APP. P. 44.1(a). To determine whether the error probably resulted in an improper judgment, we must review the entire record. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995).

---

[12] Appellees argue this objection fails to comport with appellees' complaints on appeal. However, this objection specifically apprised the trial court that appellant objected to the parts because they were not included on appellees' exhibit list. Appellants also objected they had not had an opportunity to inspect the parts, which we conclude was sufficient to inform the trial court that appellants were surprised.

Reversible error usually does not occur in connection with an evidentiary ruling unless the judgment turns on the complained-of evidence. *Id.*

Appellants' entire argument on appeal regarding any harm they suffered from the use of the parts as demonstrative exhibits is "the prejudice and surprise was self-evident as it was sprung on the defense during" Farmer's testimony and "[o]nce the objects were identified as the same parts removed and shown to the court, the prejudice attached." Although we question whether appellants adequately briefed the harm analysis, *see* TEX. R. APP. P. 38.1(h), (i), we have reviewed the entire record to determine whether the use of the parts as demonstrative evidence probably resulted in an improper judgment. After sustaining appellants' objection to the admission of the parts into evidence, the trial court stated it would allow Farmer to use the parts as demonstrative aids and that is looking at the parts only "to see what the parts look like." Along with the parts used by Farmer as demonstrative exhibits, there were other demonstrative exhibits, including parts used by Sanchez during his testimony and drawings of the engine, that also showed the trial court "what the parts looked like." Further Sanchez admitted he welded two plugs into the ports of the EGR cooler, one of the parts reviewed by the trial court, and disputed only that his conduct caused any harm to the truck's engine. Based on this record, we cannot conclude the trial court's judgment turned on Farmer's use of the parts removed from appellees' truck as demonstrative exhibits. We resolve appellants' tenth issue against them.

### The DTPA

We finally address appellants' second through seventh issues, challenging the trial court's findings they were liable under the DTPA and the amount of damages awarded by the trial court. To establish their DTPA claim against appellants, appellees were required to prove (1) they were consumers as defined by the DTPA; (2) appellants engaged in false, misleading, or deceptive acts, breached an express or implied warranty, or engaged in an unconscionable action or course

of action; and (3) these acts constituted a producing cause of appellees' damages. TEX. BUS. & COM. CODE ANN. § 17.50(a) (West 2011); *Doe v. Boy's Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995); *Bishop Abbey Homes Ltd. v. Hale*, No. 05-14-01137-CV, 2015 WL 9167799, at *10 (Tex. App.—Dallas Dec. 16, 2015, pet. denied) (mem. op.).

In their fifth through seventh issues, appellants assert the evidence is legally and factually insufficient to support the trial court's findings that appellants: (1) committed unconscionable acts or practices; (2) breached warranties; and (3) breached the DTPA "laundry list."[13] Appellants, however, failed to substantively brief any of these complaints. An appellant's brief must concisely state all issues or points presented for review and, among other things, must contain a clear concise argument for the contentions made, with appropriate citations to authorities and to the record. TEX. R. APP. P. 38.1(i). We may not speculate as to the substance of the specific issues asserted by an appellant and may not make a party's argument for him. *Strange v. Cont'l Cas. Co.*, 126 S.W.3d 676, 678 (Tex. App.—Dallas 2004, pet. denied); *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). And we have no duty to perform an independent review of the record and the applicable law to determine if the trial court erred. *Strange*, 126 S.W.3d at 678; *Castro v. Castro*, No. 04-14-00785-CV, 2015 WL 8984139, at *1 (Tex. App.—San Antonio Dec. 16, 2015, pet. filed) (mem. op.). An appellant's failure to cite legal authority or provide substantive analysis of a legal issue results in waiver of the complaint. *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (observing that error may be waived by inadequate briefing); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). We conclude appellants have waived their fifth through seventh issues and resolve those issues against them.

---

[13] The DTPA "laundry list," set out in section 17.46(b) of the business and commerce code, identifies deceptive acts that are actionable under the statute. *Diais v. Land Rover Dallas, L.P.*, No. 05-15-00115-CV, 2016 WL 1298392, at *8 (Tex. App.—Dallas Apr. 4, 2016, no pet. h.) (mem. op.); *see also* TEX. BUS. & COM. CODE ANN. § 17.46(b)(1)–(31) (West Supp. 2015).

We next turn to appellants' complaints in their second through fourth issues that the trial court erred by awarding: (1) economic damages of $16,600.14, because the evidence is legally and factually insufficient to support the awarded damages and some of the damages amount to a double recovery; (2) mental anguish damages of $5,000, because the evidence is factually insufficient to support the award; and (3) additional economic damages of $16,600.14 and additional mental anguish damages of $5,000, because the evidence is legally and factually insufficient to support a finding that appellants' conduct that violated the DTPA was committed knowingly or intentionally.

A plaintiff who prevails on a DTPA claim may recover the amount of economic damages found by the factfinder. TEX. BUS. & COM. CODE ANN. § 17.50(b)(1). "Economic damages" are "compensatory damages for pecuniary loss, including costs of repair and replacement." *Id.* § 17.45(11). If the factfinder determines the defendant's conduct that violated the DTPA was committed knowingly or intentionally, the plaintiff may also recover damages for mental anguish. *Id.* § 17.50(b)(1). Finally, the factfinder may award additional damages of "not more than three times the amount of economic damages" if the defendant acted knowingly and "not more than three times the amount of damages for mental anguish and economic damages" if the defendant acted intentionally. *Id.*; *see also Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n.29 (Tex. 2003).

*Economic Damages*

The trial court awarded appellees economic damages of $16,600.14, representing "(1) the total amount paid by [appellees] to [appellants] and subsequent third parties to restore the Truck to proper working condition, and (2) [appellees'] transportation expenses during the Truck's inoperability resulting from [appellants'] faulty repairs, intentional damage, and intentional misrepresentations." In their second issue, appellants first argue there is no evidence to support

the award of economic damages of (1) $6,161, the amount paid by appellees to appellants for the installation of the long block in June 2010; (2) $1,405.71, the amount paid by appellees to Juan's Transmission to repair the transmission; and (3) $3117.87, the amount paid by appellees to rent a car from March 2, 2011, through July 6, 2011. Appellants specifically argue that Farmer did not opine about the installation of the long block or about the cause of the transmission failure and appellees rented a car because Brenda's car began experiencing problems and not because of any work performed by appellants on the truck. We construe appellants' complaint to be the evidence is legally insufficient to establish their conduct was the producing cause of these elements of the economic damages awarded by the trial court. *See* TEX. BUS. & COM. CODE ANN. § 17.50(a) (consumer may maintain action under DTPA where defendant's conduct that violated DTPA was producing cause of economic damages).

As to the installation of a long block into the truck in June 2010, the trial court concluded appellants violated the DTPA by (1) intentionally misrepresenting to appellees that the truck could be restored to proper working order for $3,800, and then charging appellees $6,161;[14] (2) intentionally representing to appellees that the work and repairs on the truck would restore it to proper working order;[15] (3) breaching an implied or express warranty by failing to repair the truck;[16] and (4) engaging in an unconscionable course of conduct by taking advantage of appellees' lack of knowledge or experience to a grossly unfair degree by intentionally charging for repairs that were not completed in a good and workmanlike manner, where the work was

---

[14] *See* TEX. BUS. & COM. CODE ANN. § 17.46(b)(13) (West Supp. 2015) (knowingly making false or misleading statements concerning need for parts, replacement or repair service is violation of DTPA).

[15] *See id.* § 17.46(b)(22) (representing that work or services have been performed on, or parts replaced in, goods when work or services were not performed or parts replaced is violation of DTPA)

[16] *See id.* § 17.46(b)(12) (representing an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law, is violation of DTPA).

below the standards for an automobile engine repair mechanic and appellants intentionally overcharged for parts and labor, and charging for unnecessary repairs.[17]

Both Brenda and Gonzalo testified they were not automobile mechanics and, while they knew the truck was overheating, they did not know the cause of the problem. Gonzalo testified he told Sanchez about the problems with the truck and asked Sanchez what was wrong with the truck and how much the repairs would cost. Sanchez initially provided a quote of $3,800 for the installation of a "long block" into the truck but, when the work was completed, appellants charged appellees $6,161 for the work. Brenda and Gonzalo testified that, after they picked the truck up following the June 2010 work, the truck was still overheating and had developed additional problems. The trial court found that Sanchez intentionally misrepresented the truck was in proper working condition.

Farmer testified he believed the truck could have been repaired in June 2010 by the replacement of the EGR cooler. He also testified that, when Gonzalo brought the truck to FD&P, the engine on the truck was not clean and did not look new and the pistons had a manufacturer's part number, rather than being an "aftermarket" part. This led him to believe appellants had not performed all the work on the truck that they represented had been done in June 2010. We conclude there is more than a scintilla of evidence to support the trial court's conclusion that appellants violated the DTPA by performing unnecessary repairs in June 2010 and by not performing all the work on the truck that they represented to appellees had been done.

As to the payment to Juan's Transmission to repair the transmission of the truck, the trial court concluded appellants violated the DTPA by (1) intentionally misrepresenting to appellees that their truck would be restored to proper working condition by installing a new EGR cooler

---

[17] *See id.*§§ 17.50(a)(3) (consumer may maintain cause of action under DTPA based on an unconscionable action or course of action by any person); 17.45(5) ("unconscionable action or course of action" is "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree").

–24–

for $750, charging appellees $1,198 for the repairs, and failing to repair the truck;[18] (2) intentionally misrepresenting to appellees that appellants' work and repairs on the truck would restore it to proper working order, but failing to restore the truck to working order and causing further damage to the truck, rendering it inoperable;[19] and (3) breaching the implied warranty of good and workmanlike repairs by failing to repair the engine and actually causing further damage to the truck.[20]

Farmer testified that, at some point, the engine in the truck overheated to the point it melted an oil bypass plug designed to withstand temperatures of 500 degrees Fahrenheit. In Farmer's opinion, the engine overheated to this degree due to the work Sanchez performed on the engine, including welding plugs into the ports of the EGR cooler. Farmer also testified that, when the engine overheated to this point, the transmission fluid could also overheat, leading to damage to the transmission. Sanchez admitted he drove the truck after he completed the repairs and noticed the transmission was not working properly. Both Brenda and Gonzalo testified the transmission was working when they took the truck to appellants in March 2011. We conclude there is more than a scintilla of evidence to support the trial court's conclusion that appellants violated the DTPA by misrepresenting the truck would be repaired, failing to repair the truck, and performing work that caused further damage to the truck.

As to the costs appellees incurred to rent a car, the trial court found that, due to engine problems, the truck was inoperable from March 2011 through July 2011, and appellants incurred $3,117.67 in rental car fees from March 2, 2011, through July 6, 2011, while the truck was inoperable. Brenda testified the truck was the main source of transportation for the family.

---

[18] *See id.* § 17.46(b)(13).

[19] *See id.* §17.46(b)(22).

[20] *See id.* §17.50(a)(2) (consumer may maintain cause of action under DTPA where breach of an express or implied warranty is producing cause of economic or mental anguish damages).

When the truck was not working, the family attempted to manage their transportation needs using her small car and a pickup truck they borrowed from a neighbor. However, in March 2011, her car began to have mechanical difficulties so they were forced to rent a car. Accordingly, although Brenda's car becoming unreliable was the final factor that forced appellees to rent a car, doing so would not have been necessary if the truck had been repaired properly by appellants. We conclude there is more than a scintilla of evidence to support the trial court's award of the rental car fees to appellees.

Appellants finally assert appellees were allowed a double recovery of economic damages because the trial court found the work Farmer performed on the truck restored it to working condition. Therefore, appellants argue, the additional award to appellees of the charges for the work performed by appellants and Juan's Transmission on the truck constituted a double recovery.

The DTPA allows a trial court to make "orders necessary to restore to any party to the suit any money or property, real or personal, which may have been acquired in violation of this subchapter." TEX. BUS. & COM. CODE ANN. § 17.50(b)(3). "[S]ection 17.50(b)(3)'s restoration remedy contemplates mutual restitution." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 826 (Tex. 2012). Restoration provides a consumer prevailing on a DTPA claim "the option of unwinding the transaction, returning the parties to the status quo ante," or restoring the parties to their original positions. *Id.* If it is possible to ascertain the benefit the consumer received from the transaction, that benefit must be deducted from the awarded damages. *Id.* 826–27.

The trial court awarded appellees $16,600.14, representing the amounts appellees paid to appellants, Juan's Transmission, and Farmer and for the rental car.[21] The trial court, therefore, awarded appellees all of the out-of-pocket expenses they incurred in connection with the repair

---

[21] We note these amounts actually total $16,601.14.

work on the truck. However, after Farmer completed his work on the truck, appellees had a working vehicle. This was not the status quo when appellees took the truck to appellants in June 2010 to be repaired. Farmer testified that, in his opinion, the truck could have been repaired in June 2010 by replacing the EGR cooler, work that would have cost approximately $900. Therefore, if appellants had properly repaired the truck in June 2010, appellees would have paid them $900 for the work.

To restore the parties to the position they were in prior to the transaction that violated the DTPA, the benefit appellees received from the transaction must be deducted from their economic damages. *Cruz*, 364 S.W.3d at 826–27; *Steele v. Goddard*, No. 10-12-00111-CV, 2013 WL 3013671, at *12–13 (Tex. App.—Waco June 13, 2013, pet. denied) (mem. op.). We, therefore, conclude that, although there is evidence to support an award of economic damages to appellees, the $16,600.14, awarded by the trial court is not supported by the evidence. If, as we conclude here, part of a damages award lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *see also* TEX. R. APP. P. 46.3 (court of appeals may suggest a remittitur); *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009). Consequently, we suggest a remittitur of $900 of the economic damages awarded by the trial court as well as $900 of the additional economic damages awarded by the trial court. As the prevailing party at trial, appellees must be given the option of accepting the remittitur or having the case remanded for a new trial. TEX. R. APP. P. 46.3; *Larson*, 730 S.W.2d at 641; *McLeod v. Gyr*, 439 S.W.3d 639, 650 (Tex. App.—Dallas 2014, pet. denied).

We resolve appellants' second issue against them to the extent it challenges the legal sufficiency of the evidence to establish appellants' conduct was the producing cause of certain elements of the economic damages awarded by the trial court. We resolve appellants' second

issue in their favor to the extent that the economic damages awarded by the trial court constituted a double recovery. If the suggested remittitur of $1,800 is timely filed, we will modify and affirm the judgment in accordance with the remittitur. TEX. R. APP. P. 46.3; *McLeod*, 439 S.W.3d at 650. However, if the remittitur is not timely filed, we will reverse the judgment and remand for a new trial. TEX. R. APP. P. 46.3; *McLeod*, 439 S.W.3d at 650.

*Mental Anguish*

In their third issue, appellants contend the evidence is factually insufficient to support the award of mental anguish damages to appellees. A party prevailing on a DTPA claim may recover mental anguish damages if the factfinder determines the defendant's conduct was committed knowingly or intentionally. TEX. BUS. & COM. CODE ANN. § 17.50(b)(1). In this case, the trial court found appellants intentionally engaged in conduct that violated the DTPA and awarded appellees $5,000 in mental anguish damages.

We are required to "closely scrutinize" awards of damages for mental anguish. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex. 1997); *Bishop Abbey Homes, Ltd.*, 2015 WL 9167799, at *15. "There must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded." *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). "Mental anguish is only compensable if it causes a 'substantial disruption in . . . daily routine' or 'a high degree of mental pain and distress.'" *Id.* (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995), and *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002)). Even when an event is of the type for which mental anguish damages may be recovered, there must be evidence of the nature, duration, and severity of the mental anguish. *Id.* There must also be evidence that the amount of mental anguish damages awarded is fair and reasonable compensation. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). However, damages for non-pecuniary harm such as mental anguish "do not require certainty of

–28–

actual monetized loss," but instead "are measured by an amount that 'a reasonable person could possibly estimate as fair compensation.'" *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 153 (Tex. 2014) (quoting RESTATEMENT (SECOND) OF TORTS § 905 cmt. i).

The trial court found appellees suffered significant mental anguish because their source of transportation was rendered inoperative and because of the significant strain on their personal finances from appellants' conduct. Appellants argue there is no evidence their conduct had any bearing on appellees' lives and appellees were under other "significant and longer lasting unrelated financial strains" than the costs to repair their truck, including a three-year suspension of Gonzalo by the Louisiana Racing Commission in October 2012, leading to a loss of income to appellees.

Gonzalo testified the stress from the Louisiana investigation was not a "significant stress." However, the financial stress from paying for repairs to the truck was a significant stress. According to Gonzalo, the costs to repair the truck put the family into a financial crisis. He was recovering from a heart attack and was not supposed to be working, but had to go back to work in order to provide for his family. He also had to borrow money from his father to pay for the repairs to truck. Gonzalo testified that it had been fifteen years since he had been required to borrow money from his father and he would "rather cut [his] throat than ask him for anything."

Brenda testified the "ordeal of getting the truck fixed" caused a lot of tension within the family. The truck was their main form of transportation and was used to transport their grandchildren, who were living with them, to psychological therapy and to their activities. She was "walking around crying," at "ends" with her daughter, who lived with them, because of the stress, and the grandchildren could not understand why everybody was "crabby and cranky." The cost of the repairs prevented them from paying other bills, and both she and Gonzalo were

–29–

"worried sick" about how they were going to pay for the repairs. The cost of the repairs affected her relationship with Gonzalo as well as Gonzalo's relationship with their daughter. Their daughter moved out of the house and has not spoken to Gonzalo since she left.

Appellees' testimony was "direct evidence of the nature, duration, or severity" of their mental anguish, "thus establishing a substantial disruption in [their] daily routine," and evidence that appellees suffered "a high degree of mental pain and distress that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Saenz*, 925 S.W.2d at 614 (quoting *Parkway Co.*, 901 S.W.2d at 444); *see also Bishop Abbey Homes, Ltd.*, 2015 WL 9167799, at *18. Finally, the amount of mental anguish damages awarded by the trial court was approximately one-third of appellees' economic damages. This appears to be "reasonable compensation" for their mental anguish. *See Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex. 2004) (per curiam) (concluding mental anguish damages equal to the damage award for injury to plaintiff's character and reputation was reasonable compensation).

Based on this record, we cannot conclude the trial court's award to appellees of $5,000 in mental anguish damages was against the great weight and preponderance of the evidence. We resolve appellants' third issue against them.

*Additional Damages*

In their fourth issue, appellants complain the trial court erred by awarding appellees additional economic and mental anguish damages because the evidence is legally and factually insufficient to establish appellants acted knowingly or intentionally. The trial court awarded additional economic damages of $16,600.14 and additional mental anguish damages of $5,000. Because the trial court awarded both additional economic and mental anguish damages, we consider whether the evidence is sufficient to support the trial court's finding that appellants

–30–

acted intentionally. *See* TEX. BUS. & COM. CODE ANN. § 17.50(b) (allowing recovery of additional economic and mental anguish if defendant's conduct was intentional).

The statute defines "intentionally" as:

Actual awareness of the falsity, deception, or unfairness of the act or practice, or the condition, defect, or failure constituting a breach of warranty giving rise to the consumer's claim, coupled with the specific intent that the consumer act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness. Intention may be inferred from objective manifestations that indicate that the person acted intentionally or from facts showing that a defendant acted with flagrant disregard of prudent and fair business practices to the extent that the defendant should be treated as having acted intentionally.

TEX. BUS. & COM. CODE ANN. § 17.45(13). Actual awareness occurs when "a person knows that what he is doing is false, deceptive, or unfair." *McLeod*, 439 S.W.3d at 652 (quoting *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53–54 (Tex. 1998) (per curiam)).

The trial court found Sanchez intentionally misrepresented to appellees that (1) the truck was in proper working condition following the June 2010 repairs, (2) he would honor the warranty of the work even after the six-month warranty period expired, and (3) the truck was in proper working condition following the March 2011 repairs. The trial court concluded the misrepresentation that the warranty would be honored was made with an intent to induce appellees to return the truck to appellants for additional work. The trial court further concluded these multiple misrepresentations, along with the totality of the evidence, showed appellants intended to deceive appellees as to the true cost of the repair work and to induce them to pay more money for repairs and that appellees knew the representations they made to appellees that the truck was in proper working order were false.

The trial court also found appellants "purposefully" damaged and disabled components in the cooling system of the truck, causing extensive further damage and that appellants' purpose for damaging and disabling the cooling components was to further damage the truck and induce appellees to pay for additional repair work. The trial court concluded appellants intended to

–31–

cause further damage to the truck by purposefully damaging and disabling parts of the cooling system.

There was evidence Sanchez told appellees after the June 2010 and March 2011 repairs that the truck had been repaired when the truck had not actually been repaired. Further, Gonzalo testified Sanchez told him to bring the truck back in March 2011 and that it was not a problem it was out of warranty. According to Farmer, the problems the truck was experiencing in June 2010 were likely due to a faulty EGR cooler. Appellants replaced the EGR cooler in March 2011, but charged appellees for the work rather than fixing it under the warranty. Although he claimed his work did not damage the engine, Sanchez admitted that he welded plugs into ports in the EGR cooler. Farmer testified that Sanchez's work caused the engine to overheat, leading to extensive damage to the engine.

We conclude the evidence was both legally and factually sufficient to support the trial court's findings that appellants intentionally engaged in conduct that violated the DTPA. Accordingly, the trial court did not err by awarding additional economic and mental anguish damages, and we resolve appellants' fourth issue against them.

**Conclusion**

We resolve appellants' first and third through tenth issues against them. We resolve appellants' second issue in their favor to the extent of suggesting remittitur of $900 of the economic damages and $900 of the additional economic damages awarded by the trial court. We resolve the remainder of appellants' second issue against them. In accordance with rule of appellate procedure 46.3, if appellees file with this Court within fifteen (15) days from the date of this opinion a remittitur of $900 in economic damages and $900 in additional economic damages, we will modify the trial court's judgment to award appellees $15,700.14 in economic damages, $5,000 in mental anguish damages, $15,700.14 in additional economic damages, and

–32–

$5,000 in additional mental anguish damages, as well as the attorney's fees awarded by the trial court, and affirm the trial court's judgment as modified. If the suggested remittiturs are not filed timely, we will reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion. *See* TEX. R. APP. P. 46.3.


/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE


141616F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LONE STAR ENGINE INSTALLATION
CENTER, INC. AND RAFAEL SANCHEZ,
Appellants

No. 05-14-01616-CV        V.

BRENDA GONZALES AND GONZALO
GONZALES, Appellees

On Appeal from the 191st Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. DC-11-15035.
Opinion delivered by Justice Fillmore,
Justices Evans and Stoddart participating.

In accordance with this Court's opinion of this date, we suggest a remittitur in the amount of $1,800.00 on appellees Brenda Gonzales and Gonzalo Gonzales's claims under the Texas Deceptive Trade Practices Act. In accordance with Texas Rule of Appellate Procedure 46.3, if appellees Brenda Gonzales and Gonzalo Gonzales file with this Court within fifteen (15) days from the date of this Court's opinion in this case a remittitur in the amount of $1,800.00, we will modify the trial court's judgment to award appellees Brenda Gonzales and Gonzalo Gonzales $15,700.14 in economic damages, $5,000 in mental anguish damages, $15,700.14 in additional economic damages, $5,000 in additional mental anguish damages, $15,000 in attorney's fees rendered through the trial of this case, $7,500 as a reasonable attorney's fee for this appeal, and $5,000 in attorney's fees if appellants Lone Start Engine Installation Center, Inc. and Rafael Sanchez file an unsuccessful petition for review in the Texas Supreme Court, along with pre- and post-judgment interest, on their claims under the Texas Deceptive Trade Practices Act and affirm as modified. If the suggested remittitur is not filed timely, we will reverse the trial court's judgment and remand the case for further proceedings.

It is **ORDERED** that each party bear their own costs of this appeal.

Judgment entered this 11th day of May, 2016.